## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

LIVING LANDS, LLC,
a West Virginia Limited Liability Company,
D. C. CHAPMAN VENTURES, INC.
a West Virginia Business Corporation,

                Plaintiffs,

v.                                    CIVIL ACTION NO.  3:24-0356

HAROLD WARD, in his official capacity
as the Cabinet Secretary of the West Virginia
Department of Environmental Protection,
an instrumentality of the State of West Virginia,

                Defendants.

## MEMORANDUM OPINION & ORDER

Pending before the Court is Defendant Harold Ward's Motion to Dismiss with Prejudice. ECF No. 17. For the following reasons, this Motion is **GRANTED**.

## I.      Background

This case reprises a dispute between Plaintiffs Living Lands, LLC and D.C. Chapman Ventures, Inc. and Defendant Ward, the Cabinet Secretary of the West Virginia Department of Environmental Protection (WVDEP). In this iteration of the case, Plaintiffs allege Defendant is violating the Clean Water Act (CWA) at the "Subject Property." The Subject Property is a piece

of real property located in the Right Fork Spruce Run Watershed in Nicholas County, West Virginia.[1] *Compl.* ECF No. 1, at 1.[2]

Plaintiff D.C. Chapman Ventures, a West Virginia corporation, purchased the Subject Property in the late 1990s. *Id.* at 12–13. In 2019, Plaintiff Living Lands purchased an option to purchase the Subject Property from D.C. Chapman Ventures. *Id.* at 13. Plaintiff Living Lands is a limited liability corporation with a business model that emphasizes purchasing real estate to repurpose or redevelop. *Id.* at 12. Plaintiffs' option contract states, in relevant part, that Living Lands' right to purchase expires:

> Two (2) years from the date the Option is executed in the event that Optionee fails to seek and obtain appropriate legal and equitable relief, either from those persons and entities with legal responsibility for the investigation and abatement of any adverse environmental conditions at or affecting the present or future uses of the Property, or any conditions that may present endangerments to the health or the environment at, in the vicinity of, or adversely affecting the Property prior to consummating the purchase of the Property.

*Option Agreement*, *Living Lands, LLC et al. v. Cline et al.*, 3:20-cv-00275, ECF No. 1-1 (S.D. W. Va.) (incorporated by reference, *Compl.* at 13).

The option contract also provides Living Lands with the authority to act in the name of D.C. Chapman Ventures to pursue legal remedies that may benefit the Subject Property. *Compl.* at 14. Such remedies may be necessary because the Subject Property previously housed coal mining operations for nearly three decades. *Id.* at 2. After the former operator forfeited the Subject

---

[1] Throughout this opinion, the Court treats all facts pleaded in the Complaint as true.

[2] The first page of the Complaint is notated as "0." Further, the paragraphs within the Complaint are numbered inconsistently. Accordingly, the Court cites only page numbers and cites them as paginated by Plaintiffs.

Property, the WVDEP began conducting reclamation activities on the Subject Property. *Id.* at 2–3. These reclamation activities triggered Plaintiffs' suit.

The parties are not strangers to this Court. This suit is the second that Plaintiffs have brought against Defendant over reclamation efforts at the Subject Property. In 2020, Plaintiffs alleged Defendant had committed violations under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), Resource Conservation and Recovery Act (RCRA), and Clean Water Act. *Living Lands, LLC et al. v. Cline et al.*, 3:20-cv-00275 (S.D. W. Va.) (*Living Lands I*).

In *Living Lands I*, Plaintiffs made allegations relevant to the current case. Plaintiffs previously argued that Defendant violated the CWA by using unlined surface impoundments to hold acid mine drainage (AMD), by collecting AMD-contaminated leachate and surface runoff in unlined ditches, and by discharging AMD into Right Fork Spruce Run. *Living Lands, LLC v. Cline*, 657 F.Supp.3d 831, 836 (S.D. W. Va. 2023). One of the surface impoundments, Surface Impoundment No. 1, and one of the ditches, Ditch No. 2, are at issue in the current case. After the close of discovery in *Living Lands I*, Plaintiffs filed for leave to amend their complaint and then attempted to constructively amend their complaint through briefing. *Id.* at 837–38, 851. The Court rejected both efforts. *Id.* This Court then granted summary judgment for Defendant. *Id.* at 851. Plaintiffs appealed the decision, and the Fourth Circuit affirmed this Court's opinion. *Living Lands, LLC v. Ward*, No. 23-1641, 2024 WL 1615011 (4th Cir. 2024).

Plaintiffs have now returned before this Court to allege three counts against Defendant. Count I alleges that "the ongoing, unpermitted 'discharge of pollutants' from Ditch [No.] 2" at the Subject Property is in violation of CWA §§ 301(a) and 402. *Compl.* at 32. Count II alleges that "the ongoing, unpermitted discharge of 'storm water associated with industrial activity' collected

and conveyed directly into navigable waters by unlined Ditch [No.] 2" at the Subject Property is in violation of CWA §§ 301(a) and 402(p). *Id.* at 35 (emphasis removed). Count III alleges that Defendant has violated the terms and conditions of National Pollutant Discharge Elimination System (NPDES) Permit No. WV1027786. *Id.* at 37. Count III contends Defendant is violating this permit:

> [B]y allowing the ongoing discharge into unlined Surface Impoundment No. 1 at the Subject Property of untreated acid mine drainage collected and conveyed by an underground pipe at the site and its subsequent discharge from that impoundment into the surface waters of an unnamed tributary of Right Fork-Spruce in violation of [CWA] §§ 301(a) and 402[.]

*Id.* at 37 (emphasis removed).

Defendant motioned to dismiss this complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). He contends Plaintiff Living Lands does not have standing, these counts are barred by principles of *res judicata*, and the counts fail to state a claim under the Clean Water Act.

## II.    Legal Standard

To survive a 12(b)(6) motion to dismiss, a complaint must state plausible claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007). Plaintiffs must set forth "grounds" for an "entitle[ment] to relief" that are more than mere labels, conclusions, or the recitation of the elements of a cause of action. *Id.* at 555 (citations omitted). A complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citation omitted).

When analyzing a motion to dismiss, courts accept the factual allegations in a complaint as true. *Id.* A court must "draw[] all reasonable factual inferences from those facts [alleged] in the plaintiff's favor . . . ." *Martin v. Duffy*, 858 F.3d 239, 248 (4th Cir. 2017) (internal quotations omitted) (quoting *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (internal citations omitted)).

However, those allegations "must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555 (citations omitted).

The Fourth Circuit has confirmed courts may resolve *res judicata* issues at the motion to dismiss stage. *See Andrews v. Daw*, 201 F.3d 521, 524 n.1 (4th Cir. 2000) (citing *Thomas v. Consolidation Coal Co.*, 380 F.2d 69, 75 (4th Cir. 1967)). However, courts may do so only when the issue "clearly appears on the face of the complaint[.]" *Id.* (quoting *Richmond, Fredericksburg & Potomac R. Co. v. Frost*, 4 F.3d 244, 250 (4th Cir. 1993)). When presented with a motion to dismiss based on *res judicata* principles, courts "may take judicial notice of facts from a prior judicial proceeding when the res judicata defense raises no disputed issue of fact[.]" *Id.* (citations omitted).

### III.    Analysis

Defendant contends that each Count in Plaintiffs' complaint should be dismissed. He argues that Plaintiff Living Lands lacks standing to bring these claims, principles of *res judicata* bar the claims, and the counts all fail to state a claim. The Court analyzes each argument below.

#### a.    Standing

Standing is a constitutional requirement for cases before the federal judiciary. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiffs must demonstrate injury in fact, causation, and redressability to establish standing to bring their claims. *Id.* at 560–61.

Defendant contests whether Plaintiff Living Lands has standing to sue. Specifically, Defendant asserts that Plaintiff Living Lands cannot assert an injury in fact. Defendant argues that Plaintiff Living Lands' option agreement to purchase Plaintiff D.C. Chapman Venture's land has expired. Per the relevant terms of the option agreement, the option to purchase the land expires "[t]wo (2) years from the date the Option is executed in the event that Optionee fails to seek and

obtain appropriate legal and equitable relief[.]" *Option Agreement* at 3. Defendant argues that Plaintiff Living Lands has failed to obtain relief within two years and, therefore, no longer has a right to purchase this land or pursue these claims.

Plaintiff Living Lands disagrees. Plaintiff Living Lands argues that it has sought and continues to seek the requisite relief. Plaintiffs argue that though they did not anticipate a situation where the litigious efforts exceeded two years, they have agreed that the option agreement is still in effect.

There may be an argument that Plaintiff Living Lands no longer has a right to purchase the land in question. However, since no party contests that D.C. Chapman Venture, the owner of the property in fee simple, has standing, such a determination would not be dispositive on the claims. Therefore, the Court will proceed with its analyses of Defendant's *res judicata* and CWA arguments, which together provide for the resolution of this case in its entirety.

### b. *Res Judicata*

*Res judicata* instructs on the preclusive effects of judgments. The doctrine includes two distinct but related concepts: claim preclusion and issue preclusion. *In re Varat Enterprises, Inc.*, 81 F.3d 1310, 1315 (4th Cir. 1996). Relevant to this case is claim preclusion, which prevents parties from relitigating matters that arise from the same cause of action. *Id.* In addition to claims brought, claim preclusion generally bars every claim that could have been presented. *Id.*

Federal rules of *res judicata* govern this case since the previous case was brought in federal court. *Andrews*, 201 F.3d at 524. A successful claim preclusion defense must show: (1) a final judgment on the merits in a prior suit, (2) an identity of the cause of action in both the earlier and the later suit, and (3) an identity of parties or their privies in the two suits." *Jones v. SEC,* 115 F.3d

1173, 1178 (4th Cir.1997) (internal quotation marks omitted), *cert. denied,* 523 U.S. 1072 (1998). Only the second prong is meaningfully contested in this case.[3]

In cases implicating claim preclusion, the Fourth Circuits employs a "transactional approach analysis." *Meekins v. United Transp. Union*, 946 F.2d 1054, 1058 (4th Cir. 1991). This analysis requires a court to determine whether "the new claim arises out of the same transaction or series of transactions as the claim resolved by the prior judgment." *Id.* (quoting *Harnett v. Billman*, 800 F.2d 1308, 1313 (4th Cir. 1986)). A "transaction" generally "connotes a natural grouping or common nucleus of operative facts." Restatement (Second) of Judgments § 24 cmt. b.

Two cases are particularly instructive here: the Seventh Circuit's decision in *Supporters to Oppose Pollution, Inc. v. The Heritage Group*, 973 F.2d 1320 (7th Cir. 1992) and this Court's decision in *Ohio Valley Env't Coal. v. Fola Coal Co., LLC*, No. CV 2:17-3013, 2018 WL 1833215 (S.D. W. Va. Apr. 17, 2018).

In *Supporters*, a group called Supporters to Oppose Pollution (StOP) was party to a successful RCRA suit that required the original defendant to close its landfill, pay a fine, and take corrective action. *Id.* at 1322. In the last minute of that litigation, StOP tried to add another defendant, The Heritage Group, an investor in the original defendant. *Id.* The district court rejected

---

[3] Plaintiffs do state "that this Court's dismissal of Plaintiffs' claims regarding violation of the NPDES permitting requirements at Ditch 2 at this site was not based upon an adjudication by this Court of the merits of that claim." *Pls.' Resp.* at 7. Plaintiffs do not explain the import of this statement. However, if Plaintiffs sought to challenge prong one of the claim preclusion analysis with this point, their argument fails.

The case law is clear that not every legal theory needs to be mentioned for a dismissal to be considered a "final judgment on the merits." *Aliff v. Joy Mfg. Co.*, 914 F.2d 39, 43 (4th Cir. 1990) ("The law, however, is well established that *res judicata* may apply even though the plaintiff in the first suit proceeded under a different legal theory. A prior judgment on the merits binds the parties "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but [also] as to any other admissible matter which might have been offered for that purpose.") In this case, there is a final judgment on the merits to which all parties were privy. *Living Lands, LLC v. Ward*, No. 23-1641, 2024 WL 1615011 (4th Cir. 2024).

this maneuver, largely due to StOP's lack of diligence. *Id.* Dissatisfied with the original defendant's inability to pay the fine, StOP brought additional suits in an effort to involve Heritage. *Id.* In each additional suit, StOP cited to a different section of RCRA. *Id.* at 1325. StOP also argued that, though there were no new deposits on the shuttered landfill, the ongoing releases from the landfill constituted new and actionable wrongs. *Id.* The district court disagreed and relied on claim preclusion to dismiss the litigation. *Id.* at 1323.

The Seventh Circuit affirmed the district court's decision. *Supporters* 973 F.2d at 1325–27. The Seventh Circuit first reasoned that "[c]laim preclusion bars all claims that were or could have been raised against the parties and their privies in the first case."[4] *Id.* at 1325. Accordingly, the new legal theories were barred. The Seventh Circuit then held the parties knew of the ongoing releases in the initial suit. *Id.* at 1326. The new evidence of these releases showed an additional injury, not an additional wrong. *Id.* The parties had already litigated over the wrong: the illegal operation of the landfill. *See id.* at 1322. StOP's "inadequate preparation" cost the group its one, and only, opportunity to be heard on that wrong. *Id.* at 1327–28.[5]

This Court then distinguished *Fola* from *Supporters*. 2018 WL 1833215, at *7. In *Fola*, the plaintiffs brought a series of CWA and SMCRA suits against Fola Coal. *Id.* at *1–2. In the first of two relevant previous suits, the parties reached a consent decree that resolved a concern related

---

[4] The Seventh Circuit treated Heritage as in privity with the original defendant, making the privity question of the claim preclusion analysis a non-issue. *Id.* at 1325. This treatment makes sense because StOP's argument for holding Heritage liable was that Heritage was the original defendant's *alter ego*. *Id.* at 1322.

[5] While there is no Fourth Circuit case directly on point to the present case, the Fourth Circuit's decision in *Peugeot Motors of Am., Inc. v. E. Auto Distributors, Inc.* illustrates that a party alleging continuing violations does not always prevent the application of a *res judicata* bar. 892 F.2d 355, 359 (4th Cir. 1989) ("We do not believe that the mere fact that [Defendant's] questioned policies continued after the 1981 litigation allows [Plaintiff] to make the same legal claim about the same policies that were litigated and on account of which relief was denied in prior litigation.")

to selenium discharge from one of Fola's mines. *Id.* at *8. In a subsequent suit, the plaintiffs shifted their focus from excessive selenium discharge to ionic pollutants and conductivity issues. *Id.* at *3. The plaintiffs were unsuccessful in the second suit. *Id.*

Then, in *Fola*, the plaintiffs brought another suit, which overlapped with many of the claims in the previous two suits. *Id.* The Court summarized the overlap as such:

> Plaintiffs are now on their third challenge to discharges from outlets at the Surface Mine No. 4A. More specifically, including this action, Plaintiffs have challenged discharges from Outlets 022 and 023 three times, two of which allege violations due to the discharge of ionic pollutants leading to conductivity issues in Right Fork.

*Id.* Despite the legal and factual overlap, this Court rejected Fola's claim preclusion arguments and allowed the claims to proceed.

The crux of this Court's rationale in distinguishing *Fola* from *Supporters* was that while under RCRA, "on-going releases may illustrate additional injury, under the CWA and SMCRA, violation of a permit condition constitutes a discrete wrongful act." *Id.* at *7. The claims in *Supporters* focused on the past wrong of the illegal operation of a landfill, whereas the claims in *Fola* focused on continuous permit violations, each of which constituted a new wrong.

After emphasizing the distinction between past wrongs and recurring new wrongs, the Court then focused on the difference in time of the violations. The consent decree in the first case precluded only violations through its effective date, and the dismissal of the second case encompassed only the separate wrongs within the timeframe of that litigation. *Id.* at *7–8; *accord* Restatement (Second) of Judgments § 24 ("What factual grouping constitutes a "transaction" . . . are to be determined pragmatically, giving weight to such considerations as whether the facts are

related in *time*, space, origin, or motivation") (emphasis added). Therefore, the plaintiffs could sue on the violations that followed the consent decree and dismissal. *Fola,* 2018 WL 1833215, at *7–8.

Relying on *Supporters* and *Fola* for guidance, the Court will determine which of the Counts in this case, if any, may proceed.

     *i.   Counts I and II*

Defendant first argues that claim preclusion bars Counts I and II. He characterizes Counts I and II as "nothing more than a slight reframing of the same core facts at issue in the first suit[.]" *Def.'s Mem.* at 15. Defendant contends that Plaintiffs outlined these claims in the pre-suit notice in *Living Lands I*, demonstrating that these claims were available to Plaintiffs. Defendant also notes this Court rejected Plaintiffs' efforts to raise these claims at the summary judgment stage in *Living Lands I*. He asks the Court to do the same with this new attempt at claim resuscitation.

In response, Plaintiffs do not contest Defendant's characterization of Counts I and II but argue *Fola* prevents the application of claim preclusion in this case. Plaintiffs seem to agree that Count I is the same claim they tried to bring in an amended complaint. However, Plaintiffs claim Counts I and II should still survive because Defendant "is engaged in an on-going violation of the NPDES permitting requirements of CWA §[§] 301(a) and 402 at Ditch 2 of this site." *Pls.' Resp.*, ECF No. 19, at 8.

The Court disagrees with Plaintiffs' *Fola* analogy. In *Fola*, the plaintiffs alleged ongoing violations of permit conditions, each of which was a new wrong. *Fola*, 2018 WL 1833215, at *7. Plaintiffs cannot allege ongoing permit violations in this case because core to Plaintiffs' complaint is that Ditch No. 2 is unpermitted. *Compl.* at 32–37. Therefore, Plaintiffs must point to a new wrong to avoid claim preclusion.

To find a new wrong, Plaintiffs allude to an "on-going violation of the NPDES permitting requirement[.]" *Pls.' Resp.* at 9. Specifically, the wrong repeatedly identified in Plaintiffs' Complaint is the unpermitted nature of Ditch No. 2 and of the pollution it allegedly discharges. *Compl.* at 32–37 (identifying the "ongoing, *unpermitted* 'discharge of pollutants' from Ditch [No.] 2" (emphasis added)).

Contrary to Plaintiffs' position, the lack of a permit for Ditch No. 2 or its discharge is not a new wrong at all. According to Plaintiffs' Complaint, this wrong dates back to when WVDEP took over the property, *see id.*, and, therefore, predates *Living Lands I*. Since there is no new wrong in this case, *Fola* does not apply. Instead, the ongoing discharges of pollutants and storm water that Plaintiffs allege in Counts I and II are better understood as new harms traceable to an old wrong, as was true in *Supporters*.

Plaintiffs have failed to identify a new wrong in Counts I and II. Further, they do not contest that there was a previous final judgment on the merits or that the parties were in privity with each other in the prior suit. Therefore, the only remaining step of the claim preclusion analysis is to determine whether Counts I and II arise from the same cause of action adjudicated in *Living Lands I.*

The claims in *Living Lands I* and Counts I and II each rely on the same common nucleus of operative fact and, therefore, arise out of the same transaction. This common nucleus includes facts related to the operation of Ditch No. 2, the pollutants that may flow into and out of Ditch No. 2, and whether Ditch No. 2 requires a CWA permit.

Count I is essentially the same claim Plaintiffs attempted to bring in previous litigation. In *Living Lands I*, Plaintiffs' CWA claims alleged WVDEP allowed unlined drainage ditches to discharge pollution via groundwater. *Living Lands, LLC v. Cline*, 657 F. Supp. 3d 831, 850

-11-

(S.D. W. Va. 2023). In Plaintiffs' response to Defendant's motion for summary judgment, Plaintiffs shifted their argument to state that Ditch No. 2 was directly discharging into Right Fork Spruce Run. *Id.* at 850–51. Plaintiffs also attempted to file an amended complaint that alleged the same violations, and relied on similar facts, as Count I. *Compare Proposed Second Amend. Compl.*, *Living Lands I*, ECF No. 100-1 ¶¶ 113–24 (alleging "ongoing, unpermitted point source discharges of pollutants to navigable waters in violation of Clean Water Act Section 301 and 402"), *with Compl.* at 32–35 (alleging "ongoing, unpermitted 'discharge of pollutants' from Ditch No. 2 at this site in violation of CWA Sections 301(a) and 402").

Count II also arises from the same cause of action as the claims in *Living Lands I.* In contrast to the more general discharge of pollutants alleged in Count I, Count II focuses specifically on "storm water associated with industrial activity." *Compl.* at 35. Plaintiffs did not seek to introduce this precise legal theory in *Living Lands I.* However, this claim was undoubtedly also available to Plaintiffs at the time of *Living Lands I.* Plaintiffs recognize as much. *Compl.* at 36 ("Both prior to and following the modification/reconstruction of unlined Ditch [No.] 2 as part of the 'reclamation' activities . . . there have been and continue to be Storm Water Discharges Associated with Industrial Activity from unlined Ditch [No.] 2") (emphasis removed).

Counts I and II fail to identify a new wrong that postdates *Living Lands I.* Further, since *Living Lands I* concluded with a final judgment on the merits, involved the same parties as this case, and shares a cause of action with Counts I and II, claim preclusion is appropriate. Accordingly, the Court **DISMISSES** Counts I and II.

ii. *Count III*

Defendant argues that Count III should also be barred by claim preclusion. Per Defendant, the legal theory in Count III could have been brought in *Living Lands I* and relies on facts that were available, open, and obvious at that time. Plaintiffs make no arguments concerning Count III.

Count III alleges new wrongs. Unlike Counts I and II, Count III alleges that Defendant is violating conditions of an NPDES permit. *Compl.* at 40–41. As was the case in *Fola*, each new permit violation constitutes a new wrong for which Plaintiffs may sue. *Fola*, 2018 WL 1833215, at *7. Defendant's argument that Plaintiffs could have previously raised this legal theory is irrelevant. While the violations that occurred prior to *Living Lands I* may be precluded, Plaintiffs have not yet had an opportunity to litigate over the wrongs subsequent to that litigation. In fact, Count III alleges violations of the permit after its February 27, 2024, renewal. Therefore, the Court will not bar Count III on claim preclusion grounds.

c. Clean Water Act

Count III, the lone remaining claim, alleges Defendant has violated CWA §§ 301(a) and 402. Section 301(a) of the CWA declares that, except when in compliance with certain sections including § 402, "the discharge of any pollutant by any person shall be unlawful." Section 502(12) defines "discharge of a pollutant," in relevant part, as "any addition of any pollutant to navigable waters from any point source[.]" Further, § 502(14) defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe [or] ditch . . . from which pollutants are or may be discharged." Section 402 establishes the NPDES permit program. Generally, NPDES permits include limitations on the discharge of pollutants and detail reporting requirements.

-13-

Defendant maintains that Count III fails to state a claim. Core to his argument is that Plaintiffs never identify a violation of an effluent limitation or condition of Defendant's NPDES permit. Defendant also points out that Plaintiffs do not know the original source of the effluent discharged from the underground pipe mentioned in Count III. Per Defendant, this gap in knowledge casts doubt on Plaintiffs' claim that any AMD entering Surface Impoundment No.1 from the underground pipe is untreated. Defendant further contends that even if the effluent discharged into Surface Impoundment No. 1 from the underground pipe is untreated, the effluent is treated while in Surface Impoundment No. 1 and discharged in accordance with the NPDES permit.

Plaintiffs retort that they have alleged a permit violation.[6] They note that Surface Impoundment No. 1 is only permitted to "discharge treated and stormwater runoff into an unnamed tributary of Spruce Run." *Pls.' Resp.* at 12 (quoting *NPDES Permit*, ECF No. 1-7). They contend that the AMD entering Surface Impoundment No. 1 from the underground pipe is untreated entering the impoundment and remains untreated upon discharge. This discharge, according to Plaintiffs, is therefore in violation of Defendant's NPDES permit. They point to this alleged permit violation as "a violation of an 'effluent standard or limitation[.]'" *Pls.' Resp.* at 14–15.

Many of Plaintiffs' claims are dubious at best. For instance, Plaintiffs claim that the AMD flowing from the underground pipe is untreated, yet Plaintiffs admit they do not know the origin of the pipe. Next, Plaintiffs, without citation, claim that mixing and diluting the AMD cannot constitute "treatment" for purposes of Defendant's NPDES permit. Finally, Plaintiffs do not allege

---

[6] Defendant reads Plaintiffs' arguments as also alleging that the discharge from the underground pipe into Surface Impoundment No. 1 is a CWA violation. Insofar as Plaintiffs make such an argument, the argument fails. Plaintiffs have not alleged any facts that could possibly enable Surface Impoundment No. 1 to fit within the definition of "navigable waters." *See* Clean Water Act § 502(7); 40 C.F.R. § 120.2.

that the discharge leaving the point source and entering navigable waters violates any quantifiable effluent limitation.

The Court need not address these potential flaws, however, because Plaintiffs have not alleged a violation of Defendant's NPDES permit. Plaintiffs argue that the only way for AMD to be treated on this property is for it to pass through the lime-doser located on the Subject Property. Plaintiffs' claim that the AMD leaving the underground pipe never goes through the lime-doser and, therefore, remains untreated upon discharge from Surface Impoundment No. 1. However, the NPDES permit has no such requirement.

Defendant's NPDES Permit grants Defendant permission to "operate and maintain a water treatment facility and discharge treated and stormwater runoff into an unnamed tributary of Spruce Run on Brushy Fork of Muddlety Creek of the Gauley River." *NPDES Permit*. Immediately following this statement, the permit reads "[t]his permit is subject to the following terms and conditions: [t]he effluent limitations, monitoring requirements and other conditions set forth in Section[s] A, B, C, and D." *Id.* Section A details discharge limitations and monitoring requirements for the permit. *Id.* Section B includes a schedule of compliance. *Id.* Section C incorporates several terms and conditions by reference. Section D sets out other requirements, such as reporting for spills and accidental discharges. *Id.* Nowhere is there a requirement mandating the lime-doser as the definitive form of treatment.

Plaintiffs do not, and cannot, point to any language that dictates all AMD must pass through the lime-doser to be considered treated. Instead, Plaintiffs essentially ask the Court to add a requirement to the NPDES permit. The Court may not do so. As such, Plaintiffs have failed to allege a violation of Defendant's NPDES permit. This alleged violation is essential to Plaintiffs' claim that Defendant violated an "effluent standard or limitation[.]" *Pls.' Resp.* at 14–15. Without

-15-

such a violation, Plaintiffs have no legal argument and have failed to state a claim. Accordingly, the Court **DISMISSES** Count III.

As all counts are dismissed, the Court need not address Defendant's other contentions for dismissal.

### IV.    Conclusion

Based on the above analysis, the Court **GRANTS** Defendant's Motion to Dismiss. ECF No. 17.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        March 13, 2025

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE